**ROWAN COMPANIES, INC., Appellant,**

v.

**TRANSCO EXPLORATION COMPANY, INC., Appellee.**

No. 01–84–0082–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Sept. 20, 1984.

Rehearing Denied Oct. 11, 1984.

Raybourne Thompson, Jr., John L. Carter, Vinson & Elkins, Houston, for appellant.

Dan Matthews, Fulbright & Jaworski, Houston, for appellee.

Before JACK SMITH, BASS and COHEN, JJ.

## OPINION

COHEN, Justice.

This is a breach of contract suit brought by Rowan against Transco, which resulted in a take nothing judgment for the defendant, Transco.

In 1976, Rowan agreed to furnish an offshore oil rig and crew to Transco to drill two oil wells in the Gulf of Mexico. On

September 20, 1977, a blowout and fire occurred on the rig, the Rowan-Odessa, during drilling of the second well. The fire burned until October 6, 1977, and the rig remained at the site and was used to plug and abandon the second well until November 24, 1977, when it was towed away for repairs, which continued until June 26, 1978. On January 26, 1978, Transco gave written notice to Rowan claiming a right to terminate the contract as of January 31, 1978, pursuant to the force majeure clause of the contract.

Rowan then brought this suit claiming more than $3.8 million for Transco's failure to pay amounts due under the repair rate clause of the contract between November 24, 1977, and June 26, 1978, plus contractual pre-judgment interest at 12% per year and attorney's fees.

Transco answered with a general denial and affirmative defenses of abandonment of the contract, recission of the contract, novation, and estoppel. Transco specifically denied that the repair rate of $17,865 per day was applicable. It alleged that the force majeure rate of $17,865 per day applied only up to the date of termination, and that Rowan could not recover even that, according to Transco's pleadings, because Rowan never gave written notice of the force majeure to Transco, as required in the force majeure clause.

The jury found that the cause of the blowout and fire was beyond Transco's reasonable control; that Transco was not negligent in failing to place a 5½" liner through the 14,600' gas sand; and that Transco's decision to continue drilling to 15,500' was not negligent, thus exonerating Transco from all accusations of negligence.

The jury found against Transco on all of its affirmative defenses.

The jury found that it was reasonable to repair the Rowan-Odessa and that Rowan used reasonable diligence in completing repairs by June 26, 1978.

The jury further found that the parties did not intend, when they executed the contract, that, in the event of any one instance of repair, the operating rate ($18,365 per day) would be payable for the first twelve hours and the repair rate ($17,865 per day) would be payable for the rest of the time required for repairs. Rowan had argued that the contract unambiguously provided, as a matter of law, that the repair rate should apply during the entire period, but, if the repair rate clause was ambiguous, then the parties intended that the higher operating rate apply for the first twelve hours and the repair rate thereafter. The jury's answer to this issue was, therefore, adverse to Rowan.

Rowan's points of error 1, 2 and 3 contend that the contract unambiguously provided, as a matter of law, that Rowan was entitled to collect the repair rate of $17,865 per day from November 24, 1977, until June 26, 1978; and, even if the repair rate clause was ambiguous, the evidence established, as a matter of law, that the parties intended for the repair rate to be payable during this period, and that the jury's finding that the parties did not so intend was against the great weight and preponderance of the evidence.

The first issue for decision is which of several daily contract rates in the contract applies and for what period of time. Rowan contends that the "repair rate" of $17,865 a day should be payable throughout the entire period of November 24, 1977, to June 26, 1978. Rowan specifically denied in its pleadings that an event of force majeure had occurred; consequently, according to Rowan, the force majeure clause did not apply. The force majeure daily rate was the same as the daily repair rate, $17,865; however, the vital difference between the two clauses affecting the amount of damages was that the force majeure clause, quoted below, provided for termination upon five days notice, unlike the repair rate clause, which had no termination provision.

Transco asserted that a force majeure event had occurred and that, pursuant to its notice of January 26, 1978, any liability it may have had thereunder ended five days later on January 31, 1978.

The repair rate clause, which was relied upon by the plaintiff, Rowan, provided:

The repair rate will be payable in the event operations are suspended on account of breakdown, maintenance or repair of contractor's equipment (as distinguished from routine inspection, lubrication, change of pump liners, repacking swivel, slipping of drilling line, etc.) during the period in excess of twelve (12) continuous hours in any one instance, up to a maximum of seventy-two (72) hours accumulated repair time at the operating rate during any thirty (30) day period.

The force majeure clause, upon which the defendant, Transco, relied, provided:

14. Neither party hereto shall be liable, other than to make payments due hereunder, including Force Majeure rate provided for in schedule "A" (6) which shall be applicable during periods of Force Majeure for failure to perform the terms of this agreement when performance is hindered or prevented by strikes, lockouts, riots, war (declared or undeclared), acts of God, insurrections, *fire*, storm, interference of any governmental authority, inability to obtain critical materials including drill pipe and bits, *or other cause beyond a reasonable control of such party*, whether or not similar to the causes herein specified. In case either party hereto shall be unable, wholly or in part, because of such cause of Force Majeure, to carry out its obligations under this agreement, it shall promptly give written notice to that effect to the other party, stating the particulars of such Force Majeure, and such party shall also give written notice to the other party of the termination of such conditions. The performance of any obligation or obligations suspended while Force Majeure is operative, shall be resumed as soon as reasonably possible after the termination thereof, and the time of such suspension shall not be considered as time expended for the performance of any obligations under the provisions of this agreement. Should any act of Force Majeure causing the suspension of operations hereunder continue for a period of thirty days or more, either party shall have the right to terminate this agreement by giving the other party written notice five (5) days in advance of the date of termination subject to payments due .... (emphasis added)

Schedule A to the contract was entitled "Rates of Payment to Contractor", Rowan, and its paragraph 6, entitled "Force Majeure Rate", provided:

The Force Majeure rate, ($17,865 per day) will be payable during periods when conditions defined in Articles 10 and 14 occur.[1] If during such periods less than full crews are utilized, appropriate costs of such reduced labor and payroll burden shall be deducted from the daily rate.

Rowan's objective was to obtain a judgment under the repair rate clause because if that clause controlled, Rowan was owed $17,865 a day until June 26, 1978, whereas, if the force majeure clause controlled, Rowan was owed $17,865 per day only until the contract's termination on January 31, 1978. Thus, Rowan's first amended petition denied that an event of force majeure had occurred, stating:

Transco's written notice of January 26, 1978 did not terminate the contract pursuant to Paragraph 14 (force majeure) because:

(1) The blowout that occurred ... was not an event of force majeure, rather it was caused by the negligence of Transco in ... drilling ... to a depth greater than that contemplated by its well plan and ... drilling without properly casing off the opened well hole, both of which were acts within the control of Transco and not acts beyond its reasonable control.

(2) And, independently, the blowout, even if it had been the result of acts beyond Transco's reasonable control, (a) did not continue for a period of thirty (30) days and (b) certainly no act of force majeure was continuing at the time of

---

1. Neither party has claimed that Article 10 applies to this dispute.

the attempted termination in January of 1978.

■ We hold, as a matter of law, that the rig's inability to perform was solely due to an event of force majeure as defined in the contract. Therefore, the force majeure clause controls the rights of the parties, not the repair rate or the operating rate clause.

It is not disputed on appeal that the blowout caused the fire, and that the fire caused the damage which incapacitated the rig and required repairs. It is also undisputed on appeal that the cause of the blowout and fire was beyond the reasonable control of Transco and that Transco was not negligent. A fire beyond the control of Transco is within the contractual definition of a force majeure event.

■ Nevertheless, Rowan argues that, before a fire or other cause beyond the reasonable control of a party can be a force majeure giving rise to a right to terminate the contract, the event must continue for more than thirty days, and it is agreed that the fire lasted less than thirty days. Rowan relies upon the language in the force majeure clause stating:

"Should any act of force majeure causing the suspension of operations hereunder continue for a period of thirty days or more, either party shall have the right to terminate this agreement by giving the other party written notice five days in advance of the date of termination ...".

Thus, Rowan argues that Transco had no right to terminate the contract on account of a fire lasting seventeen days followed by fire damage repairs for seven months. The fire must continue to burn for thirty days or more, Rowan argues, regardless of the time it takes to repair the fire damage. Rowan cites no authority for this proposition. We reject this argument.

We hold that it is not necessary for an *act* of force majeure, such as a fire causing suspension of operations, to continue for more than thirty days. We construe the language above to mean that, if an act of force majeure causes a suspension of oper-

ations, and the suspension of operations continues for thirty days or more, the right to terminate arises under the contract. Any other construction would render the words "causing the suspension of operations hereunder" meaningless. No fire, storm, riot, war, strike or other listed hazard constitutes a force majeure at all except "when performance is hindered or prevented ...". If the fire in this case had lasted thirty days, but not hindered or prevented performance, no force majeure event would have occurred. The proper inquiry is, therefore, whether performance was hindered or prevented for thirty days by a listed event of force majeure, not whether the listed event itself lasted thirty days or more. Indeed, it is difficult to imagine a storm, or an act of God, as that term is defined in law, lasting more than thirty days, further evidence that Rowan's strained interpretation of the language would effectively nullify at least those two specific provisions. Yet, under Rowan's construction of the force majeure clause, twenty-nine continuous days of hurricanes, tornados, and typhoons which left a rig indefinitely crippled would not be an event giving the right to terminate under the force majeure clause, nor would twenty-nine uninterrupted days of lightning strikes or twenty-nine continuous days of bombing by a hostile government. We reject this interpretation of the contract.

Points of error one, two and three are overruled.

Point of error five asserts that the trial court erred in refusing to enter judgment for Rowan for payments due after January 31, 1978, because Transco had no right to terminate the contract at that date. We overrule point of error five for the reasons stated in our discussion of points of error 1, 2 and 3, above.

■ Rowan's point of error four contends that the trial court erred in refusing to enter judgment for Rowan because, even if the repair rate clause of the contract was legally ambiguous and not intended by the parties to be paid while the rig was being repaired, the contract elsewhere provided

that Rowan be paid the daily rate of at least $17,865 at all times until the contract terminated. Rowan's assertion is correct and entitles it to payment of $17,865 per day from November 24, 1977 until January 31, 1978. We reach this conclusion even though the petition upon which Rowan went to trial specifically claimed that the force majeure rate did not apply because the fire had lasted for less than thirty days. Indeed, in trial court proceedings which yielded a statement of facts 860 pages long and a 200 page transcript, we have been directed to only one request by Rowan for recovery at the force majeure rate, and this is in a footnote to one paragraph of its motion for judgment. The argument is repeated in another footnote in Rowan's appellate brief.

■ We observe, however, that Rowan pled a cause of action for breach of contract, which concluded with a general prayer for relief. Ironically, it was the defendant, Transco, which asserted that an event of force majeure had occurred giving it a right to terminate. Rowan's Exhibit 10 is Transco's letter to Rowan dated January 26, 1978, claiming a right to terminate under the force majeure clause. Transco's pleadings alleged both a force majeure event and, consequently, a right to terminate. Transco makes the same allegation in this court.

Nevertheless, Transco argues that it should not have to pay the force majeure rate despite its continuous reliance upon the force majeure clause. Transco argues that there are no pleadings to support a recovery by Rowan for any contract breach except failure to pay the repair rate, and that any judgment allowing Rowan a recovery on any other portion of the contract would unfairly surprise Transco and deprive it of a fair right to defend because Transco relied upon the specific allegations concerning the repair rate ($17,865 per day) in Rowan's pleadings. Transco claims that it would have defended differently had it known that Rowan sought recovery of a rate other than the repair rate. Transco makes the argument in order to dissuade

this court from making any award based upon the "operating rate" ($18,365 per day), but the argument is equally applicable to any claim for recovery by Rowan under the force majeure rate ($17,865 per day).

Transco's argument has no merit under the facts of this particular case and the law of this state. The strange posture of this dispute left Transco in the position of asserting at all times that an event of force majeure had occurred. Transco can hardly claim unfair surprise when this court agrees with its arguments that it validly terminated the contract on January 31, 1978, because of an event of force majeure. Transco needed no notice to defend a claim of force majeure because Transco was itself the proponent of the claim. Transco's conduct is entirely inconsistent with any intent to rely on its contractual right to notice, and the duty to notify was not so significant an obligation that its breach materially affected the value Transco received. *United States Fidelity & G. Co. v. Bimco Iron & M. Corp.*, 464 S.W.2d 353, 357 (Tex.1971) (holding a notice defense waived under such circumstances). Having successfully argued the point, as a matter of fact before the jury, and as a matter of law before this court, Transco nevertheless says it would be unfairly surprised if this court accepts its arguments. Although Transco may be surprised, this is not the type of unfair surprise against which our rules of pleading protect.

■ Second, under Texas law a party is not required to plead his measure of damage. *See, e.g.,* 2 R. McDonald *Texas Civil Practice in District and County Courts* sec. 6.17.1, at 108 (rev.1982):

The plaintiff is not required to allege the applicable legal measure of damages, but the court must be able to ascertain from the petition as a whole the appropriate remedy. Whether the petition states a "cause of action" depends upon the adequacy of the allegations to establish his right and a violation thereof by the defendant, *rather than upon the statement of a particular remedy to which*

*he believes himself entitled.* If the allegations reflect, and the proof establishes, that he is entitled to some relief and furnish information from which the proper judgment may be determined, the court (if not prevented by the insufficiency of the prayer) should award the appropriate recovery. *So a petition containing allegations from which the correct measure of damages can be ascertained will not be fatally defective—although subject to ˇchallenge by special exception—because it fails to state the correct measure, or states a measure which is affirmatively erroneous.*

(Emphasis supplied, citations omitted.)

Tex.R.Civ.P. 47 requires only a short and concise, statement of a cause of action (i.e., breach of a specific contract) and damage from such breach. It does not require an allegation of the particular contract provision which allows or precludes recovery. *Pringle v. Nowlin,* 629 S.W.2d 154 (Tex. App.—Fort Worth 1982, writ ref'd n.r.e.); *Parker v. McGinnes,* 594 S.W.2d 550, 552 (Tex.Civ.App.—Waco 1980, no writ); *Adams v. Morris,* 584 S.W.2d 712, 719 (Tex. Civ.App.—Tyler 1979, no writ); *Seureau ̇v. Mudd,* 515 S.W.2d 746, 747 (Tex.Civ.App.—Houston [14th Dist.] 1974, writ ref'd n.r.e.); *Aetna Cas. & Sur. Co. v. Clark,* 427 S.W.2d 649, 656 (Tex.Civ.App.—Dallas 1968, no writ). Most of the cited cases adopt the rule found at 28 Tex.Jur.3d *Damages* sec. 196 (1983): "All that is necessary is that the petition sufficiently allege facts establishing a cause of action from which the court can determine the proper measure of damages, such as the nature or extent of the injury complained of. If the facts establishing the cause of action are sufficiently set up in the pleadings, and if they are supported by the evidence, the measure of damages is a matter of law for the court."

■ In its pleading in the trial court, Transco argued that Rowan could not recover under the force majeure clause because Rowan was negligent and because Rowan failed to give written notice that a condition of force majeure existed. The jury found no negligence by Rowan, and Transco has cited no authority indicating that recovery is barred under the force majeure rate for failing to give written notice of the event of force majeure. The relevant part of paragraph 14 of the contract provides:

In case either party hereto shall be unable, wholly or in part, because of such cause of force majeure, to carry out its obligations under this agreement, it shall promptly give written notice to that effect to the other party, stating the particulars of such force majeure, and such party shall also give written notice to the other party of the termination of such conditions.

Transco does not deny on appeal that it was promptly notified of the fire. The language requiring written notice does not indicate that it is a condition precedent to invocation of relief under the force majeure clause, nor does it impose any sanction for failure to give written notice. No harm to Transco is apparent from the lack of written notice, the daily rate for repairs and force majeure being the same, $17,865.00.

Perhaps most important, Transco requested no special issue from the jury regarding whether written notice was given, or whether failure to notify was a material breach of contract. Under these circumstances, we cannot say that failure to notify, if any, should make recovery by Rowan under the force majeure clause unavailable. Tex.R.Civ.Pro. 279.

One of Transco's many defenses in this case was that the force majeure clause was controlling and conferred upon it the right to terminate. This strategy was intended to reduce Transco's liability on the contract to no more than approximately ⅓ of the $3.8 million Rowan claimed. Having claimed the benefits of the force majeure clause, Transco should not escape its consequences.

Point of error four is sustained.

■ Rowan is entitled to rendition of judgment in its favor because it has proved, as a matter of law, that an event of

force majeure occurred which entitled it to payment at a fixed rate set by the contract, $17,865 per day, for a fixed time period, November 24, 1977, until January 31, 1978. The parties stipulated that all invoices were received by Transco five days after the date shown on each invoice. The contract undisputedly provided that all payments were due from Transco thirty days after receipt of invoices and that 12% interest per year would begin to run five days after payment was due. Thus, the amount of damages is fixed,[2] and the date on which interest begins to run,[3] as well as the rate of interest, is also fixed. An award of pre-judgment interest is correct under such facts. *Republic National Bank v. Northwest National Bank*, 578 S.W.2d 109, 116 (Tex.1978).

■ We further sustain Rowan's point of error number six, that the trial court erred when it refused to enter judgment for Rowan for $7,671.84 plus 12% interest per year from October 30, 1977, on its claim for the value of a piece of equipment known as a "hex kelly". The parties stipulated at trial that Rowan furnished the hex kelly at Transco's request and that its reasonable value was $7,671.84. The trial court apparently refused to enter judgment for Rowan for that amount because Rowan declined Transco's tender of the $7,671.84, plus interest, unless it included $165,000 in attorney's fees found by the jury to be reasonable for prosecution of Rowan's claim in the trial court. The trial judge, being unwilling to award $165,000 in attorney's fees to a party prevailing upon a claim of only $7,671.84, declined to enter any judgment at all for Rowan. Since we have held that Rowan prevailed, as a matter of law, on a much more substantial claim and, therefore, was entitled to attorney's fees as awarded by the jury, the only reason for declining to enter judgment for the amount of the hex kelly no longer

exists. We, therefore, render judgment for Rowan for $7,671.84, plus interest at 12% per year from October 30, 1977.

■ We finally sustain point of error number seven, that the trial court erred when it refused to enter judgment for Rowan for its attorney's fees, pre-judgment interest and costs because Rowan was entitled to such recovery due to Transco's breach of contract. Inasmuch as Rowan is now the prevailing party as result of proceedings in this court, it is entitled to recover pre-judgment interest under the contract at 12% per annum, plus costs of court and attorney's fees of $165,000 for services through trial, plus an additional $30,000 for services rendered on appeal to this court.

The district court's judgment is reversed, and judgment is hereby rendered in favor of Rowan Companies, Inc. and against Transco Exploration Company, and it is ordered that Rowan Companies, Inc. have and recover from Transco Exploration Company the following amounts: (1) $112,028.44 for November 24–30, 1977, with interest at 12% per year from January 22, 1978, (forty days after the invoice for November, 1977) until the date of this judgment; (2) an additional amount of $553,815, for December 1–31, 1977, plus interest thereon at the rate of 12% per annum from February 21, 1978, (forty days after the invoice for December, 1977) until the date of this judgment; (3) an additional amount of $553,815 for January 1–31, 1978, plus interest thereon at a rate of 12% per annum from March 19, 1978, (forty days after the invoice for January, 1978) until the date of this judgment; (4) an additional $7,671.84 for the hex kelly, plus interest thereon at the rate of 12% per annum from October 30, 1977, (forty days after the hex kelly invoice) until the date of this judgment; (5) an additional $165,000 as attorney's fees, as awarded by the jury for

---

**2.** Damages equal $17,865 per day for each day from November 24, 1977, until January 31, 1978, with credit allowed for part of the day of November 24, 1977.

**3.** Interest begins forty days after the date of the invoices for November, and December, 1977, and January, 1978. The dates of these invoices were December 13, 1977, January 12, 1978, and February 7, 1978, respectively. The hex kelly invoice was dated September 20, 1977.

services in the trial court, with interest at the legal rate from October 25, 1983, the date the trial court signed its final judgment; (6) an additional $30,000, as awarded by the jury for attorney's fees in this court, with interest at the legal rate from date of the judgment of this Court of Appeals; (7) an additional $10,000, as awarded by the jury, if application for a writ of error is filed to the Texas Supreme Court; (8) and an additional $10,000 if the application for writ of error is granted by the Texas Supreme Court.

It is further ordered that all costs in the trial court and in the Court of Appeals are adjudged against Transco Exploration Company.